CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

September 29, 2025

LAURA A. AUSTIN, CLERK
BY:
s/A. Beeson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

LARRY YOUNG, JR.,                    )
                                     )
            Plaintiff,               )        Case No. 7:23-cv-00586
                                     )
v.                                   )        **MEMORANDUM OPINION**
                                     )
DANIEL STUART, *et al.*,             )        By:    Hon. Thomas T. Cullen
                                     )               United States District Judge
            Defendants.              )

Plaintiff Larry Young, Jr., proceeding *pro se*, filed a civil-rights action asserting claims under 42 U.S.C. § 1983 against seven campus police officers associated with the University of Virginia. (*See* Compl. [ECF No. 1].) Defendants have jointly moved to dismiss Plaintiff's claims against them for lack of subject matter jurisdiction (Defs.' Mot. to Dismiss under Rule 12(b)(1) [ECF No. 36]) and for failure to state a claim (Defs.' Mot. to Dismiss under Rule 12(b)(6) [ECF No. 38]). For the following reasons, the court will deny Defendants' motion to dismiss for lack of subject matter jurisdiction and grant Defendants' motion to dismiss for failure to state a claim and dismiss Plaintiff's claims in their entirety.

## I.

Plaintiff alleges that, beginning in January 2022, he was extorted and blackmailed by the Madison County Sheriff's office and the Town of Orange Police Department. (*Id.* at 4.) He alleges that on February 25, 2022, he was "blackmailed," "extorted," "sexually humiliated," and "tortured" by Town of Orange Police Chief Kilien Madison. (*Id.*) He alleges that, on February 26, 2022, he was "physically assaulted," "sexually assaulted," "tortured," and that Madison killed his dog. (*Id.*) He claims that these events caused him to suffer a mental-health

crisis on February 28, 2022. (*Id.*) It was this crisis and the surrounding events that led to Plaintiff's claims against the Defendants in this action.

Plaintiff alleges that, on February 28, 2022, at approximately 5:00 p.m., he was searching for his two-year-old daughter at the University of Virginia ("UVA"). (*Id.*) Plaintiff was armed throughout his search. (*See id.* at 15.) When Plaintiff arrived at UVA, he began searching for his daughter in various parking garages. (*Id.* at 5.) He first searched the Lee Street parking garage, then proceeded to the 11th Street parking garage. (*Id.*) When his searches at these locations were unsuccessful, he went to the Central Grounds parking garage and continued his search. (*Id.*)

Plaintiff admits that his daughter was not actually present at UVA on February 28, 2022. (*Id.* at 5–6.) Instead, Plaintiff alleges he was experiencing severe hallucinations, which caused him to believe he was seeing and hearing his daughter run around telling Plaintiff to chase her. (*Id.* at 5.) He also believed he was seeing his deceased dog walking beside him while he searched. (*Id.* at 5–6.) Plaintiff claims these hallucinations were brought on by the "torture" he experienced at the Town of Orange Police Department on February 26, 2022. (*Id.* at 5) He also claims that, at the time he was hallucinating and searching the parking garages, he had not had his medication in 91 hours, had not eaten for 99 hours, and had not slept for 107 hours. (*Id.*) He further alleges that he had not seen or spoken with his daughter in 89 hours. (*Id.*) Plaintiff alleges he "was in the wors[t] mental and physical condition of [his] life." (*Id.* at 6.)

While in the Central Grounds parking garage, he attempted to remove his daughter from the back of a black SUV. (*Id.*) He admits that his daughter was not actually in the SUV, but he was experiencing another hallucination that led him to believe she was. (*Id.*) When he

realized his daughter was not in the SUV, he exited the Central Grounds parking garage and proceeded to the Ivy Street parking garage on foot. (*Id.*) While walking to the Ivy Street garage, Plaintiff noticed some construction scaffolding set up at the Alderman Library. (*Id.*) Plaintiff climbed the scaffolding, allegedly believing it would offer a better vantage point to locate his daughter. (*Id.* at 6–7.) After he climbed the scaffolding, he noticed there were police officers running below him. (*Id.* at 7.) At the time, he believed the officers were helping him search for his daughter. (*Id.*) Accordingly, he began yelling and waving at the officers to get their attention. (*Id.*) One City of Charlottesville police officer noticed Plaintiff and shouted for him to climb down. (*Id.*)

Plaintiff alleges that, at that moment, he abruptly remembered (i) having woken up in his bedroom with his daughter missing, (ii) seeing his daughter cry and attempt to reach him while his brother-in-law held her back, (iii) the police "sexually humiliating" and torturing him while he attempted to ask about his daughter, (iv) and the police killing his dog, torturing him, sexually assaulting him, and threatening his daughter. (*Id.* at 7–8.) With these thoughts in mind, Plaintiff decided he "would rather die [than] have the police hurt [him] again." (*Id.* at 8.) Plaintiff told the police that he would not come down until he knew his daughter was safe. (*Id.*) The Charlottesville officer told him that police in another jurisdiction were looking for his wife and daughter. (*Id.*)

After about five minutes, two officers climbed the scaffolding and began talking with Plaintiff from one level below him on the scaffolding. (*Id.*) One of the officers told Plaintiff that he had Plaintiff's wife on the phone and was going to come up and give Plaintiff the phone so he could speak with his daughter. (*Id.*) About 30 seconds later, the officers appeared

on the same scaffolding level as Plaintiff. (*Id.*) Once able to see them up close, Plaintiff noted that one of the officers was the Charlottesville police officer who had spoken to him from the ground and the other was a UVA campus police officer and Plaintiff's former coworker, Aaron Wallace. (*Id.* at 9.)

The Charlottesville officer ascended first and was pointing his handgun at Plaintiff as he approached. (*Id.*) Plaintiff says that he observed the officer holding his finger on the trigger to "tak[e] the slack from his trigger" and could see the barrel of the gun pointed at his eye. (*Id.*) The officer shouted at Plaintiff that, if he moved, he would "fucking kill [him]." (*Id.*) Once the officer was within 10 feet of Plaintiff, he slid Plaintiff a cell phone and told him his wife was on the other end of the call. (*Id.*)

When Plaintiff picked up the phone, he asked his wife if she would forgive him for "not trying to get her more help" and for kicking her out of their home. (*Id.* at 9–10.) He also asked his wife if he could speak to their daughter to ensure her safety. (*Id.* at 10.) Plaintiff's wife responded that she would never forgive him and would not allow Plaintiff to speak with his daughter. (*Id.*) Plaintiff then slid the phone back to the officer and told him that his wife would not let him speak with their daughter. (*Id.*) Plaintiff alleges that he had "made it apparent" that he would not take any further action until ensuring his daughter was safe. (*Id.*)

For the next five minutes, the Charlottesville officer argued on the phone with Plaintiff's wife about letting Plaintiff speak to his daughter. (*Id.*) Plaintiff heard the officer tell his wife that "he did not want to kill this kid"—referring to Plaintiff—"because she wouldn't let him speak to his daughter." (*Id.*) Then, the officer called Plaintiff's name and approached Plaintiff with his gun holstered and his phone in his outstretched hand. (*Id.*) The officer

handed Plaintiff the phone and told him his daughter was waiting to speak with him. (*Id.* at 10–11.) Plaintiff took the phone and asked into the receiver, "Casey, [c]an you hear daddy?" (*Id.* at 11.) Plaintiff's daughter responded, "Daddy." (*Id.*) Then Plaintiff said, "Casey, daddy loves you," and his daughter replied, "Daddy, I love you." (*Id.*)

Once he heard his daughter's voice and realized she was safe, Plaintiff's legs gave out and he began to fall. (*Id.*) The Charlottesville officer, who had remained next to him during the call, caught Plaintiff and held him up, supporting him until Plaintiff stopped crying and could hold himself up. (*Id.*) The Charlottesville officer and UVA Officer Wallace then led Plaintiff down the scaffolding and onto the ground. (*Id.*) They led him over to two other officers standing below. (*Id.* at 11–12.) Those officers were Plaintiff's former supervisors, UVA Police Lieutenant Matthew McBee and 1st Sergeant Athony Fraizer. (*Id.* at 12.) Frazier and McBee had been Plaintiff's direct supervisors when Plaintiff worked as a corporate in the security division of the UVA police department and were responsible for terminating Plaintiff from that role based on a police report filed by non-party Anna Richards. (*Id.*)

The Charlottesville officer and Wallace left Plaintiff in front of the library with Frazier and McBee. (*Id.*) The two UVA officers began patting Plaintiff on the back and rubbing his shoulders. (*Id.*) Other of Plaintiff's former colleagues arrived, including UVA Police Chief Tim Longo. (*Id.* at 12–13.) Plaintiff's hands were cuffed, and McBee and Frazier began questioning Plaintiff. (*Id.* at 13.) They did not advise Plaintiff of his *Miranda* rights. (*Id.*) They told Plaintiff that he was not in trouble and would be taken to the UVA medical center to receive psychiatric care. (*Id.*) They asked Plaintiff what happened, and Plaintiff advised them that he was searching for his daughter. (*Id.*) They asked Plaintiff how he had gotten to the University, and Plaintiff

told them that he had driven his brother's truck. (*Id.*) Frazier and McBee told Plaintiff to be honest with the investigators to ensure that his brother would not receive and criminal charges. (*Id.*)

After his conversation with Frazier and McBee, Plaintiff was placed in the back of Officer Wallace's police vehicle on Alderman Road. (*Id.*) Plaintiff remained handcuffed in the back of Wallace's vehicle when Frazier approached him and continued questioning him. (*Id.*) Plaintiff alleges that he had spoken with Frazier on the phone a few days prior on February 25, 2022. (*Id.* at 14.) He alleges that he and Frazier know each other very well and that Frazier "was aware of the incident with Anna Richards and my wife." (*Id.*) He further alleges that, in addition to being his supervisor at UVA, Frazier was on Plaintiff's hiring board, promotion board, and termination board and was also a friend with whom he spoke outside of work. (*Id.*) Frazier again questioned Plaintiff about what had happened, but Plaintiff alleges that Frazier "immediately knew," from observing Plaintiff's physical and mental state, that something was wrong with Plaintiff and that he was experiencing a mental-health crisis. (*Id.*)

Soon after, Wallace approached the vehicle and opened Plaintiff's door. (*Id.* at 15.) Wallace asked Plaintiff where Plaintiff had left the gun he had in the parking garage. (*Id.*) Plaintiff told Wallace that he had left it on the top level of the scaffolding. (*Id.*) Wallace then shut Plaintiff's door and radioed another officer. (*Id.*)

Approximately 10 minutes later, Wallace returned, opened Plaintiff's door, and advised Plaintiff that he was placing him under an emergency custody order and transporting him to the UVA medical center for evaluation. (*Id.*) Wallace also asked Plaintiff if he knew anything about an outstanding warrant for his arrest. (*Id.*) Wallace did not tell him about any warrant,

did not tell Plaintiff that he was under arrest, or offer any other information on the subject before closing Plaintiff's door and leaving. (*Id.*) Plaintiff alleges that he assumed any trouble he was in was related to opening someone else's vehicle while searching for his daughter. (*Id.*)

Wallace then entered the vehicle and drove Plaintiff to the medical center. (*Id.* at 16.) While they were driving, Wallace asked Plaintiff if he was going to speak with the investigators. (*Id.*) Having been advised by McBee and Frazier that he was not in trouble, that he was being taken to the medical center to receive psychiatric care, and that he should be honest with the investigators to ensure his brother was not criminally charged, Plaintiff told Wallace he would speak to the investigators. (*Id.*)

When they arrived at the medical center, Wallace parked in the ambulance bay of the Emergency Department and removed Plaintiff from the vehicle. (*Id.*) Once outside, while standing next to the vehicle, Wallace advised Plaintiff of his *Miranda* rights. (*Id.*) Plaintiff alleges that, during the drive and while Plaintiff was waiting outside the vehicle, Wallace had spoken on the phone with someone about when to read Plaintiff his *Miranda* rights. (*Id.* at 17.)

Wallace then escorted Plaintiff inside the hospital to the nurse's desk. (*Id.*) Plaintiff was checked in to the Emergency Department and brought to a room where he was told to sit on the bed, still handcuffed. (*Id.*) Wallace remained outside the door. (*Id.*) Shortly thereafter, two nurses and a doctor entered the room to speak with Plaintiff. (*Id.*) One of the nurses began asking Plaintiff questions and typed notes on a computer while Plaintiff answered. (*Id.*) She asked Plaintiff whether he was suicidal, and Plaintiff responded that he was. (*Id.*) She asked Plaintiff whether he had ideas about how he would kill himself, and Plaintiff responded that he had considered shooting himself through the mouth. (*Id.*) She asked him why he felt that

way, and Plaintiff told her it was because he could not find his daughter. (*Id.* at 17–18.) The doctor then asked Plaintiff whether he thought the radio was talking to him, and Plaintiff advised the doctor that he heard voices and often spoke to God, but never the radio. (*Id.* at 18.)

The medical providers then left Plaintiff's room, leaving him alone. (*Id.*) About 10 minutes later, a Region Ten employee entered the room. (*Id.*) She asked Plaintiff about what had occurred, and Plaintiff told her about searching for his daughter. (*Id.*) Before Plaintiff could go into detail, an emergency medical technician entered the room and told Plaintiff he was being moved. (*Id.*) The medical technician "push[ed]" Plaintiff out of the room from where he had been sitting on the bed, and Plaintiff was never able to finish his conversation with the Region Ten employee. (*Id.* at 18–19.)

As he was escorted from the room, Plaintiff saw Wallace in the hallway. (*Id.* at 19.) Wallace followed Plaintiff as he was brought to the behavioral health unit. (*Id.*) For the next 40 minutes, Plaintiff sat alone in a room in the behavioral health unit. (*Id.*) He alleges that, while waiting there, he regained his sense of smell and began to feel pain in his body. (*Id.*) He further alleges that, while waiting in the room, he became aware, for the first time, that he was covered in blood. (*Id.*) After noting the smell of it, he observed blood on his hands, in his hair, and on his pants and boots. (*Id.* at 19–20.) He also allegedly became aware that he had severe pain in his left knee above his kneecap, along with discomfort in his genitals and anus. (*Id.* at 20.) He alleges that these sensations were accompanied by "intrusive memories" of being assaulted by the Town of Orange police. (*Id.*)

Plaintiff then noticed several UVA police officers gathering outside his door and peering through the window to his room. (*Id.*) Among the officers were Lieutenant Bacon (who had trained Plaintiff and had been one of his shift commanders), Chief Longo, Detective Eric Pluta (who had performed Plaintiff's preemployment background checks), and Sergeant Daniel Stuart (who trained Plaintiff and had been one of his shift commanders). (*Id.*) McBee and Fraizer were also present. (*Id.* at 20–21.)

Pluta and Stuart entered Plaintiff's room. (*Id.* at 21.) Pluta sat down in a chair opposite Plaintiff, and Stuart closed the door and remained standing in front of it. (*Id.*) Both officers had handguns at their sides. (*Id.*) Realizing he was handcuffed in the presence of two armed officers in a small room with the exit blocked, Plaintiff had flashbacks to what had happened a few days prior at the Town of Orange Police Department. (*Id.*) Plaintiff alleges that he had previously learned "the hard way" what would happen if he did not cooperate and therefore did not ask for an attorney. (*Id.* at 21–22.)

Pluta and Stuart told Plaintiff that Wallace had said Plaintiff wanted to speak with them. (*Id.* at 22.) They asked Plaintiff how he had arrived at the UVA campus, and Plaintiff told them he had driven his brother's truck. (*Id.* at 23.) They asked for a description of the truck and its location, and Plaintiff answered that it was a forest green truck with all-terrain tires, and it was parked in the Central Grounds parking garage. (*Id.*) Next, Pluta and Stuart asked where Plaintiff had obtained the firearm he had brought with him to UVA; he told them he had retrieved it from the residence of Thomas Nicholson in the Town of Orange. (*Id.*) Pluta and Stuart then asked Plaintiff if someone was hurt or in pain. (*Id.*) Plaintiff answered that if someone was hurt, they were not in pain. (*Id.*)

While Stuart and Pluta questioned Plaintiff, other officers gathered outside the door to the room. (*Id.*) Plaintiff felt unsafe and told Pluta and Stuart that he wanted his attorney to be present. (*Id.* at 23–24.) Pluta and Stuart remained in the room "staring" at Plaintiff. (*Id.* at 24.) Ten minutes later, a woman in a white lab coat entered the room with a computer cart. (*Id.*) When she entered, Pluta left the room, but Stuart remained. (*Id.*) The woman began questioning Plaintiff, but Plaintiff was afraid to respond in front of Stuart. (*Id.*) Near the end of their conversation, Stuart left the room, and Plaintiff revealed to the woman that he had been searching for his daughter and felt suicidal based on his failure to locate her and the "police abuse" he had suffered at the hands of Chief Madison. (*Id.* at 24–25.) The woman informed Plaintiff that his emergency custody order would be changed to a temporary detention order and that he would be transferred to an in-patient psychiatric facility to receive treatment. (*Id.* at 25.) She advised Plaintiff to try to get some rest while she processed the paperwork and then left the room. (*Id.*)

As soon as the woman left, Stuart and Pluta reentered the room. (*Id.*) Plaintiff tried to use the restroom, but Stuart and Pluta would not let him. (*Id.* at 25–26.) While he was attempting to go to the bathroom, a nurse entered the room and directed him to change out of his clothing. (*Id.* at 26.) She advised Plaintiff that she would return to collect his property and keep it safe until Plaintiff was deemed fit to have his personal property returned (*Id.*) After the nurse left, Stuart and Pluta ordered him to empty the contents of his clothes onto the bed. (*Id.*) Plaintiff alleges that he complied with their order "out of fear," emptying his pockets and placing the contents on the bed. (*Id.* at 26–27.) Stuart and Pluta took the items Plaintiff had placed on the bed and directed Plaintiff to change out of his street clothing into hospital

scrubs. (*Id.* at 27.) Plaintiff alleges that this order gave him flashbacks to being stripped and "tortured" by the Town of Orange Police Department on February 25, 2022. (*Id.*) Nevertheless, Plaintiff complied and changed into the scrubs. (*Id.*) Plaintiff advised Stuart and Pluta that there was blood on his clothing and advised them to wear gloves when the nurse came to collect it, but the nurse never collected the items. (*Id.*) Instead, Stuart and Pluta seized Plaintiff's personal effects without a warrant or Plaintiff's consent. (*Id.*)

Stuart and Pluta then informed Plaintiff that Sergeant Michael Henry, a crime scene technician, was on his way to photograph and collect DNA samples from Plaintiff. (*Id.* at 28.) Plaintiff asked Stuart whether they had a warrant to search him, and Stuart responded that, if Plaintiff did not comply, they would obtain a warrant. (*Id.*) Plaintiff ultimately consented to the search, allegedly because he was afraid that, if he did not comply, he would "receive further harm." (*Id.*)

Henry arrived around 20 minutes later, carrying a black duffle bag. (*Id.* at 28–29.) Henry removed several items from the bag and proceeded to swab Plaintiff's mouth and both his hands and wrists. (*Id.* at 29.) After this, Henry took photographs of Plaintiff. (*Id.*) While Henry was taking the photos, a nurse opened the door and began arguing with the officers. (*Id.*) The nurse told the officers that they were violating Plaintiff's HIPAA rights and needed to stop photographing him. (*Id.*) While Stuart spoke with the nurse, Henry told Plaintiff to remove his shirt and then continued to photograph Plaintiff's chest, back, and abdomen. (*Id.* at 29–30.) Once Henry finished photographing Plaintiff, he, Stuart, and Pluta left the room. Officers Gary Kollie and Makenzie Hargrave—both UVA officers and former coworkers of Plaintiff's—remained stationed outside the door. (*Id.* at 30.)

Plaintiff claims he remained in his room in the behavioral health unit without receiving medical or psychiatric care. (*Id.*) After several hours had passed, Kollie and Hargrave entered the room and handed Plaintiff documents, which Plaintiff later learned were warrants. (*Id.*) Kollie and Hargrave did not explain the documents to Plaintiff or tell him that he was under arrest. (*Id.*) According to Plaintiff, they proceeded to escort him, barefoot and wearing thin hospital scrubs, through the emergency department and back outside. (*Id.*) They then placed Plaintiff in the back of a marked patrol SUV without speaking to him. (*Id.* at 31.) Plaintiff alleges that he was so cold from walking barefoot and being placed in the SUV without heat that he was shaking. (*Id.*)

Kollie and Hargrave drove Plaintiff from the UVA medical center to the Albemarle-Charlottesville Regional Jail ("ACRJ" or "the jail"). (*Id.*) They then escorted him through the jail to the magistrate. (*Id.*) Plaintiff alleges that none of the officers nor the magistrate told Plaintiff why he had been brought to the jail. (*Id.*) He further alleges that Kollie and Hargrave did not tell the magistrate or the jail that Plaintiff was under an emergency custody order or temporary detention order. (*Id.*) Kollie and Hargrave remanded Plaintiff to the custody of ACRJ Deputy Daidone without advising Daidone about Plaintiff's hospitalization or his mental state. (*Id.* at 32.)

After Kollie and Hargrave departed, Plaintiff told Daidone about his hospitalization, emergency custody order, recommendation for a temporary detention order, and suicidal ideations. (*Id.*) He was placed on suicide watch, and from March 1, 2022, until March 4, 2022, he was held naked in an unsanitary concrete room in the intake area of the jail. (*Id.*) He was not able to communicate with anyone outside the jail and did not receive medical or mental-

health treatment. (*Id.*) The room did not have a toilet, sink, or mat to lie on, and there was no

drinking water. (*Id.*) While detained in that room, Plaintiff had to relieve himself over a hole

in the floor and was not permitted to shower. (*Id.*)

Plaintiff filed this action on September 11, 2023, against Defendants Daniel Stuart, Eric

Pluta, Michael Henry, Aaron Wallace, Gary Kollie, Makenzie Hargrave, and Matthew McBee.

(*See id.* at 1–2.) Based on his allegations, Plaintiff asserts the following claims:

> Claim 1: Defendants Kollie, Hargrave, Pluta, Stuart, Henry, and Wallace were
> deliberately indifferent to Plaintiff's medical needs in violation of the Fourteenth
> Amendment;
>
> Claim 2: Defendants McBee, Pluta, Stuart, and Wallace compelled Plaintiff to make
> self-incriminating statements in violation of the Fifth and Fourteenth Amendments;
>
> Claim 3: Defendants Pluta, Stuart, and Henry unreasonably searched Plaintiff and
> seized Plaintiff's property in violation of the Fourth Amendment; and
>
> Claim 4: Defendants Kollie and Hargrave unreasonably seized Plaintiff when arresting
> him in violation of the Fourth Amendment;

(*Id.* at 33–45.)

Defendants have jointly moved to dismiss each of Plaintiff's claims under Federal Rule

of Civil Procedure 12(b)(1), arguing that the *Rooker-Feldman* doctrine directs this court to

abstain from ruling on Plaintiff's claims (*see* Defs.' Mot. to Dismiss under Rule 12(b)(1)), and

under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can

be granted (*see* Defs.' Mot. to Dismiss under Rule 12(b)(6)). Defendants' motions are ripe for

review.

# II.

## A. Federal Rule of Civil Procedure 12(b)(1)

A party challenging subject matter jurisdiction with a Rule 12(b)(1) motion may proceed in one of two ways. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)). First, the party may lodge a facial challenge to subject matter jurisdiction, arguing that the complaint "simply fails to allege facts upon which subject matter jurisdiction can be based" *Id.* (quoting *Adams*, 697 F.2d at 1219.) When a defendant raises a facial challenge, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration," meaning "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

Alternatively, the movant can raise a factual challenge to subject matter jurisdiction, arguing that the jurisdictional allegations in the plaintiff's complaint are untrue. *Id.* (quoting *Adams*, 697 F.2d at 1219). When a defendant raises a factual challenge, the reviewing court "'may then go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations,' without converting the motion to a summary judgment proceeding." *Id.* (quoting *Adams*, 697 F.2d at 1219) (emphasis removed). "In that situation, the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.*

Regardless of the method of the challenge, the plaintiff ultimately bears the burden of proving that subject matter jurisdiction exists. *See Watkins v. Clerk of Superior Ct. for Gaston Cnty.*,

No. 3:12-CV-033-RJC, 2012 WL 5872750, at *2 (W.D.N.C. Nov. 20, 2012) (citing *Richmond,*

*Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991)).

## B. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Occupy*

*Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013). To survive such a motion, "a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). To be "plausible," a plaintiff's claim must be supported by

factual allegations sufficient to "raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555. Although this "plausibility" standard is not akin to "probability," it does require

"more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678

(citing *Twombly*, 550 U.S. at 556). The complaint must contain "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent

with' a defendant's liability, it 'stops short of the line between possibility and plausibility of

entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"In deciding whether a complaint will survive a motion to dismiss, a court evaluates

the complaint in its entirety, as well as documents attached or incorporated into the

complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)

(citations omitted). Additionally, the court "must accept as true all of the factual allegations

contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall*

*v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) (citations omitted). And, because

Plaintiff is proceeding *pro se*, the allegations are construed "liberally" in his favor. *Shaw*, 59 F.4th at 127. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief" as required by Rule 8. *Iqbal*, 556 U.S. at 679 (cleaned up).

## III.

### A. Defendants' Motion to Dismiss for Lack of Jurisdiction

In support of their Rule 12(b)(1) motion, Defendants argue that the court should dismiss Plaintiff's claims under the *Rooker-Feldman* doctrine because the Madison County Circuit Court ruled on overlapping issues in denying a motion to suppress filed in Plaintiff's criminal case. (*See* Memo. in Supp. of Defs.' Mot. to Dismiss under Rule 12(b)(1), at 6–8 [ECF No. 37].)

"[T]he *Rooker–Feldman* doctrine . . . precludes a federal court from deciding what is, in essence, an appeal of a state court judgment." *Smalley v. Shapiro & Burson, LLP*, 526 F. App'x 231, 235 (4th Cir. 2013) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994)). The doctrine "reflects and preserves [the] distribution of authority between the Supreme Court and lower federal courts." *T.M. v. Univ. of Md. Med. Sys. Corp.*, 139 F.4th 344, 348 (4th Cir. 2025). Still, the *Rooker-Feldman* doctrine "is not a 'preclusion doctrine,' nor does it 'stop a district court from exercising subject matter jurisdiction simply because a party attempts to litigate a matter previously litigated in state court.'" *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)); *see also Exxon*, 544 U.S. at 284 ("*Rooker–Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.").

Rather, it applies only to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284. And even "[w]hen there is parallel state and federal litigation, *Rooker–Feldman* is not triggered simply by the entry of judgment in state court." *Id.* Rather, "[i]f a federal plaintiff presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court." *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (citing *Exxon* 544 U.S., at 292–293) (internal quotation marks and alterations omitted).

Here, the *Rooker-Feldman* doctrine does not bar Plaintiff's claims. First, Plaintiff's claims do not arise from injuries allegedly caused by the state court's decision, so *Rooker-Feldman* does not apply. *See Hulsey v. Cisa*, 947 F.3d 246, 250 (4th Cir. 2020) (holding that the plaintiff's case did not "fall within the *Rooker-Feldman* doctrine's narrow scope" because "[f]irst and foremost, [he] is not complaining of an injury caused by a state-court judgment"). The Fourth Circuit has rejected *Rooker-Feldman* arguments where the plaintiff did not "seek redress for an injury caused by the state-court decision *itself*," but instead for injuries caused by the defendants' actions leading up to the state-court action. *Id.* (citations and internal quotation marks omitted); *see also id.* ("A plaintiff's injury at the hands of a third party may be 'ratified, acquiesced in, or left unpunished by' a state-court decision without being 'produced by' the state-court judgment." (quoting *Hoblock v. Albany Cnt. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005))).

Here, Plaintiff's claims are rooted in the actions of Defendants leading up to and during his arrest on February 28, 2022, and Plaintiff makes no claims for relief based on any allegedly harmful decision of the state court in his criminal case. "Where plaintiff's alleged injuries occurred during the investigation process, prior to any decision by the state court, plaintiff 'does not seek redress for an injury caused by the state-court decision *itself*.'" *Blackmon v. Holder*, No. 5:20-CV-524-FL, 2021 WL 2877902, at *3 (E.D.N.C. July 8, 2021) (quoting *Husley*, 947 F.3d at 250).

Second, this action does not "'invit[e] district court review and rejection' of a state-court judgment, as would typify an appeal." *Id.* (quoting *Exxon*, 544 U.S. at 584). The Fourth Circuit has explained that "[t]his criterion is not satisfied by mere overlap between state-court litigation and the plaintiff's claim; the federal action must be filed *specifically* to review the state court judgment." *Id.* (citations, alterations, and internal quotation marks omitted). When there is overlap between state-court rulings and issues presented to the federal court, the federal court is not jurisdictionally barred from hearing the plaintiff's case; instead, as long as the plaintiff "presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* (citing *Exxon*, 544 U.S. at 293); *see also id.* ("That [the plaintiff] previously may have presented to the state court some of the arguments in his federal complaint does not strip the district court of jurisdiction."). Thus, in cases like this one where the court is called upon to resolve similar legal issues without specifically reviewing the decision of a state court, the plaintiff's claims

"may encounter legal barriers, like preclusion, but the district court has jurisdiction to adjudicate those barriers[.]" *Id.* at 252.

In sum, because Plaintiff "is not a state-court loser complaining of an injury caused by a state-court judgment and specifically seeking district court review and rejection of that judgment, his federal claims are not barred by the *Rooker-Feldman* doctrine." *Id.* (citing *Exxon*, 544 U.S. at 284). The court will therefore deny Defendants' motion to dismiss for lack of subject matter jurisdiction.

## B. Defendants' Motion to Dismiss for Failure to State a Claim

In support of their motion to dismiss under Rule 12(b)(6), Defendants argue that Plaintiff's factual allegations fail to state any plausible claim for relief against them or, alternatively, that they have qualified immunity. (*See* Memo. in Supp. of Defs.' Mot. to Dismiss under Rule 12(b)(6), at 5–25 [ECF No. 39].) The court agrees that Plaintiff has not stated any claim for which relief may be granted and therefore does not need to address Defendants' alternative argument that qualified immunity shields them from liability.

Plaintiff's claims arise under 42 U.S.C. § 1983, which authorizes a civil action by a citizen deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. To state a claim under § 1983, a plaintiff must allege both (1) "the violation of a right secured by the Constitution and laws of the United States" and (2) "that the alleged deprivation was committed by a person acting under color of state law." *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011) (quoting *West v. Atkins,* 487 U.S. 42, 48 (1988)).

### A.  Deliberate Indifference to Plaintiff's Medical Needs

Plaintiff's first claim alleges that Defendants Kollie, Hargrave, Pluta, Stuart, Henry, and Wallace violated Plaintiff's Fourteenth Amendment rights through their deliberate indifference to his serious medical needs. (*See* Compl. 33–37.) He alleges that, instead of receiving medical and psychiatric care, he was questioned and searched by Stuart, Pluta, and Henry, which impeded his medical care. (*Id.* at 36.) He further alleges that Kollie and Hargrave were deliberately indifferent to his serious medical needs when they transported him, barefoot and in safety scrubs, to ACRJ without his first receiving medical care. (*Id.*)

Claims for deliberate indifference brought by pretrial detainees are, as Plaintiff states, governed by the Fourteenth Amendment, which protects pretrial detainees from governmental actions that are "not rationally related to a legitimate nonpunitive purpose or that [are] excessive in relation to that purpose." *Jenkins v. Woodard*, 109 F.4th 242, 250 n.3 (4th Cir. 2024) (quoting *Short v. Hartman*, 87 F.4th 593, 599). To state a claim for deliberate indifference to medical needs under the Fourteenth Amendment, the plaintiff must allege:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024).

Plaintiff's deliberate-indifference claims fail because he has not alleged that he was harmed by Defendants' action or inaction. In his complaint, he lists several physical and mental injuries he allegedly sustained between February 25, 2022, and February 26, 2022, at the hands

of Chief Madison and other Town of Orange police officers. (*See* Compl. 47–54.) Plaintiff specifically alleges that "[a]ll the injuries [he] ha[s] suffered came about on Friday, February 25th, 2022, and Saturday, February 26th, 2022, at the hands of Town of Orange Police Chief Kilien Madison, and an unknown male Town of Orange police officer." (*Id.* at 52–53.) He also alleges that, due the injuries sustained at the Town of Orange Police Department, he has started "taking several medications for my mental health since [his] incarceration." (*Id.* at 54.)

Though Plaintiff repeatedly alleged that Defendants should have known he was suffering a mental-health crisis, he does not allege that any of their actions or inaction caused any of his conditions to worsen, or that he suffered any harm at the hands of the Defendants in this action. This failure is detrimental to any Fourteenth Amendment deliberate-indifference claim. *See Short*, 87 F.4th at 611; *see also Stafford v. PrimeCare Med., Inc.*, 753 F. Supp. 3d 497, 505 (S.D.W. Va. 2024) (dismissing deliberate-indifference claim where the complaint "include[d] no facts explaining how [the plaintiff] suffered harm attributable to [the defendant]"). Accordingly, the court will grant Defendants' motion to the extent it seeks dismissal of Plaintiff's Fourteenth Amendment deliberate-indifference claim.

### B. Compelled Self-Incrimination

Plaintiff's second claim for relief concerns McBee, Pluta, Stuart, and Wallace's alleged violation of the Fifth Amendment's Self-Incrimination Clause (as applicable to the states through the Fourteenth Amendment's Due Process Clause). (Compl. 38–39.) Plaintiff alleges that Wallace, McBee, Stuart, and Pluta coerced Plaintiff into making incriminatory statements, which resulted in the seizure of inculpatory evidence. (*Id.* at 38.) He alleges that his involuntary statements led to the seizure and impoundment of his brother's truck and the seizure of all

property that was on Plaintiff's person at the UVA medical center, including his clothing and boots. (*Id.*) Plaintiff further alleges that his involuntary incriminating statements and the evidence seized on February 28, 2022, have been and are being "utilized against [him] in state criminal proceedings; i.e., pretrial hearings." (*Id.* at 38–39.) Plaintiff alleges that the incriminating statements he made that day were given out of fear and "to ensure [his] brother would not be criminally charged." (*Id.* at 39.) Plaintiff emphasizes that he only spoke after being told by Defendants—specifically, Defendant McBee—that he was not in trouble and would be taken to a hospital to receive help. (*Id.*)

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. State entities are bound by this guarantee via the Fourteenth Amendment's Due Process Clause. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). As a practical matter, the prohibition on compelled self-incrimination "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). "In addition, the right bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion." *Vega v. Tekoh*, 597 U.S. 134, 141 (2022) (collecting cases).

The court construes Plaintiff's complaint as claiming that his Fifth Amendment rights were violated both by (a) McBee and Wallace's questioning him at in front of the library on UVA's campus and on the way to the hospital without giving him *Miranda* warnings, and (b)

Stuart and Pluta's coercion of a *Miranda* waiver when they questioned him in the hospital's behavioral health unit.

Plaintiff cannot state a plausible § 1983 claim based on the failure of McBee and Wallace to read Plaintiff his *Miranda* rights before questioning him. In *Vega v. Tekoh*, the Supreme Court held that a violation of the "prophylactic" rules announced in *Miranda v. Arizona*, 384 U.S. 436 (1966), does not give rise to a civil claim under § 1983. *See* 597 U.S. at 138–42 (reversing the Ninth Circuit's holding that the plaintiff "could establish a violation of his Fifth Amendment right against compelled self-incrimination simply by showing that *Miranda* had been violated"). *Vega* makes clear that *Miranda* violations are not themselves Fifth Amendment violations and therefore cannot support § 1983 claims. *See id.* at 141 ("If a *Miranda* violation were tantamount to a violation of the Fifth Amendment, our answer would of course be different."). Accordingly, the court will grant Defendants' motion to dismiss Plaintiff's self-incrimination claims against McBee and Wallace for failing to *Mirandize* him.

Plaintiff has also failed to state a plausible self-incrimination claim against Pluta or Stuart for compelling incriminating statements after he was given his *Miranda* warnings. For one thing, the Fifth Amendment only precludes compelled testimony against oneself in a "criminal case." *See* U.S. CONST. amend. V. In *Chavez v. Martinez*, 538 U.S. 760 (2003), a plurality of the U.S. Supreme Court held that a § 1983 plaintiff cannot establish a Fifth Amendment violation where he or she "was never prosecuted for a crime" based on his incriminating testimony. *Id.* at 776. It made clear that "the mere use of compulsive questioning, without more" is not a constitutional violation, but reserved any decision on "the precise moment when a 'criminal case' commences" for self-incrimination purposes. *Id.* at 766.

The Supreme Court has never decided the "precise moment" the self-incrimination right attaches and can be violated. Fourth Circuit precedent, however, dictates that the right is not violated until the coerced statements are used against the speaker at a criminal *trial*.[1] *See, e.g., United States v. Riley*, 920 F.3d 200, 205 (4th Cir. 2019) ("Even with regard to statements made under circumstances that would otherwise be viewed as coercive, the Self-Incrimination Clause is violated *only* if those statements are used in a criminal trial." (citing *Chavez*, 538 U.S. at 767) (emphasis in original)); *Burrell v. Virginia*, 395 F.3d 508, 513–14 (4th Cir. 2005) ("[Plaintiff] does not allege any *trial* action that violated his Fifth Amendment rights; thus, *ipso facto*, his claim fails on the [*Chavez*] plurality's reasoning." (emphasis in original)); *Riley v. Dorton*, 115 F.3d 1159, 1165 (4th Cir. 1997) ("Any Fifth Amendment claim here thus fails, because [Plaintiff] never made a statement, much less a statement that was used at trial."), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). *But see Riley*, 920 F.3d at 207 ("The Fifth Amendment privilege against self-incrimination is violated *only* when compelled statements are used against the witness in a criminal *proceeding*." (second emphasis added)); *id.* at 205–06 (finding no Fifth Amendment violation where confession was used at a supervised-release revocation, explaining that revocation proceedings "are *not* part of the underlying criminal *prosecution*" and "are not criminal *proceedings*" (second and third emphases added)).

---

[1] Decisions from the Third, Fifth, Sixth, and Eighth Circuits hold, or suggest those courts would hold, similarly. *See, e.g., Renda v. King*, 347 F.3d 550, 559 (3d Cir. 2003) ("[I]t is the use of coerced statements during a criminal trial, and not in obtaining an indictment, that violates the Constitution."); *Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2005) ("The Fifth Amendment privilege against self-incrimination is a fundamental trial right which can be violated only *at* trial[.]"); *Maddox v. Davis*, 164 F. App'x 559, 560 (8th Cir. 2005) (affirming dismissal of § 1983 claim where plaintiff did not allege his incriminating statements "had been used against him in a criminal trial"); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 431 n.11 (6th Cir. 2005) ("The *Chavez* decision may leave room for a challenge to the use of coerced statements in a grand jury proceeding, however the thrust of the opinion rests on the view that the Fifth Amendment is a trial protection.").

Here, Plaintiff has not alleged that his incriminating statements were used against him at a criminal *trial*. Rather, he alleges that his statements and the evidence seized at the hospital have been "utilized against [him] in state criminal proceedings," specifically, "pretrial hearings." (Compl. 38–39.) Accordingly, under the predominant view in this Circuit, any claim based on the violation of his self-incrimination rights fails because Plaintiff has not shown that any incriminating statements or evidence obtained were used against him during his criminal *trial. See Riley*, 920 F.3d at 205.

For these reasons, Plaintiff has not stated a Fifth Amendment self-incrimination claim against any of the Defendants, and the court will grant Defendants' motion to dismiss that claim.

## C.  Unreasonable Searches and Seizures

Plaintiff's final claims relate to alleged Fourth Amendment violations by Defendants Pluta, Stuart, Henry, Kollie, and Hargrave. (*See* Compl. 40–45.) The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiff alleges that Stuart and Pluta unreasonably seized his personal items and clothing without a warrant after a nurse advised him that those items would be stored by the hospital. (*Id.* at 40.) He further alleges that Henry unreasonably searched him without a warrant

### i.    Pluta and Stuart's Seizure of Plaintiff's Clothing and Personal Effects

Plaintiff's Fourth Amendment claim against Stuart and Pluta arises from the fact that the seizure was made without a warrant, and his assertion that a nurse told him the items would be stored for him at the hospital. (*Id.*) Defendants argue that the warrantless seizure

was justified under the plain-view exception to the warrant requirement. (Memo. in Supp. of Defs.' Mot. to Dismiss under Rule 12(b)(6), at 10–12.) The court agrees.

The plain-view exception applies when "(1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a 'lawful right of access' to the seized items; and (3) the incriminating character of the items was immediately apparent." *United States v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012) (quoting *United States v. Jackson,* 131 F.3d 1105, 1109 (4th Cir. 1997)). Plaintiff argues that the plain-view exception does not apply to the seizure of his clothing because the clothing was placed in a hospital bag after he removed it and therefore not in the "plain view" of Pluta or Stuart at the time they seized it. ((*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss under Rule 12(b)(6), at 32 [ECF No. 45].) But the Fourt Circuit has explicitly held that "a search of such a container is permissible under the plain[-]view doctrine when 'the contents of a seized container are a foregone conclusion.'" *Davis*, 690 F.3d at 235 (quoting *United States v. Williams*, 41 F.3d 192, 197 (4th Cir. 1994)). And "in determining whether the contents of a container are a foregone conclusion, the circumstances under which an officer finds the container may add to the apparent nature of its contents." *Id.* (quoting *Williams*, 41 F.3d at 197).

Plaintiff admits that, while he was waiting in the hospital room, there was blood coating his clothes, boots, hands, and hair. (Compl. 19–20.) He also states that he observed "multiple University of Virginia Police Officers gathering outside [his] door and peering into [his] window" while he sat in the hospital room in his bloody clothing. (*Id.* at 20.) He specifically alleges that "[t]hese officers included: . . . Detective Pluta . . . [and] Sergeant Stuart." (*Id.*) He also asserts that Pluta and Stuart entered the room and spoke with Plaintiff *before* he removed

his clothes. (*Id.* at 22–26.) He alleges that the nurse who instructed him to change out of his clothes entered his room while Plaintiff was arguing with Stuart and Pluta about using the bathroom. (*Id.* at 25–26.) He further contends that Pluta and Stuart remained in the room while he removed his clothes and that he "advised Sergeant Stuart and Investigator Pluta that [he] had blood [on this clothing]." (*Id.* at 27.)

There is no doubt from Plaintiff's allegations that both Pluta and Stuart observed Plaintiff's clothes before he removed them and knew that Plaintiff had placed them in the hospital bag. Under the circumstances, the contents of the hospital bag Plaintiff claims to have placed his clothes is was "a foregone conclusion." Therefore, the fact that Pluta and Stuart seized a bag containing the clothes does not defeat the applicability of the plain-view exception.

Plaintiff does not contest that Pluta and Stuart were lawfully present in the hospital at the time of the seizure, but he argues that that Defendant did not have lawful access to his clothing once it was placed in the hospital bag. But Plaintiff misunderstands the lawful-access requirement. That requirement "is intended to clarify that police may not enter a premises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in plain sight." *Davis*, 690 F.3d at 234. In *Davis*, the Fourth Circuit held that, because the officer-defendant was lawfully present in the plaintiff's hospital room, "he thus had lawful access in the ordinary course of his investigation to the bag of clothing" containing incriminating evidence. *Id.* (citations omitted). So too here; Pluta and Stuart were lawfully present in Plaintiff's hospital room and had lawful access to the bag of Plaintiff's clothing in the ordinary course of their investigation.

Plaintiff next argues that his clothing possessed no incriminating characteristics that were "readily apparent at the time the Defendants seized them." (Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss under Rule 12(b)(6), at 32.) Once again, Plaintiff's reliance on the fact that the clothing was placed in a bag before the officers seized it is irrelevant because the contents of the bag were a "foregone conclusion" to both Stuart and Pluta. *See Davis*, 690 F.3d at 235–36. Thus, the incriminating nature of the articles—namely that they were covered in blood which Plaintiff's allegations imply was not his—*was* readily apparent to Pluta and Stuart at the time they seized the clothing. It is beyond dispute that they knew the bag contained Plaintiff's clothes and that they knew those clothes were stained with blood. That is enough to render their incriminating nature "readily apparent" and satisfy the final prong of the plain-view exception. *See id.* at 237–38 (holding that the plaintiff's bloody clothing had "an immediately apparent incriminating nature" and citing other clothes where blood-stained clothes were properly seized without a warrant).

Lastly, Plaintiff argues that the seizure was not reasonable because it was not voluntary. (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss under Rule 12(b)(6), at 31–32.) Although consent to the seizure could have separately justified the seizure, Plaintiff's consent was not necessary because the plain-view exception obviated the need for a warrant.

For these reasons, even taking Plaintiff's allegations as true, Plaintiff's has not stated a claim that the seizure of his clothing violated the Fourth Amendment. The court will therefore dismiss Plaintiff's Fourth Amendment claim against Pluta and Stuart.

ii.  Henry's Search of Plaintiff's Body

Plaintiff next argues that Henry's warrantless search of his body violated the Fourth Amendment. But this claim fails because Plaintiff's allegations show that he consented to be searched by Henry. Though a search that is unsupported by probable cause is presumptively unreasonable, when an individual consents to be searched, a probable-cause showing is not necessary to avoid Fourth Amendment liability. *See United States v. Robertson*, 736 F.3d 677, 679 (4th Cir. 2013); *see also United States v. LeCraft*, 645 F. App'x 252, 253–54 (4th Cir. 2016) ("Warrantless searches are per se unreasonable, but there are a few specifically established and well-delineated exceptions to that general rule. One such exception to the warrant requirement is the voluntary consent given by an individual possessing the authority to do so.") (cleaned up).

Plaintiff implies that Stuart coerced his consent to the search by telling him that, if he did consent, the officers would obtain a warrant. It is true that "the police may not circumvent that important constitutional safeguard by coercing consent through 'implied threat or covert force.'" *Varner v. Roane*, 981 F.3d 288, 293 (4th Cir. 2020) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). But, if anything, Stuart's statements establish that Plaintiff did not have to consent in that moment and could have waited until the officers obtained a warrant. Nor do Plaintiff's assertions that he was afraid that if he did not consent, he would be harmed establish that his consent was coerced. There are no allegations that Henry or any other Defendant threatened him with harm or otherwise forced him to consent to the search of his person. Accordingly, even taking Plaintiff's allegations as true, the court cannot find that Plaintiff's allegations rise to the level of a Fourth Amendment violation.

iii.    <u>Kollie and Hargrave's Seizure of Plaintiff via Plaintiff's Arrest</u>

Plaintiff's final claim alleges that Defendants Kollie and Hargrave violated his Fourth

Amendment rights by arresting him without explaining the warrants they handed to him,

escorting him outside barefoot wearing only the hospital-provided "safety scrubs" to a cold

car, failing to notify the magistrate at ACRJ that Plaintiff was under an emergency custody

order and had been approved for a temporary detention order, and failing to notify ACRJ staff

about Plaintiff's hospitalization and current mental state.

"Because arrests are 'seizures' of 'persons,' they must be reasonable under the

circumstances." *D.C. v. Wesby*, 583 U.S. 48, 56 (2018) (citing *Payton v. New York,* 445 U.S. 573,

585 (1980)). Arrests authorized by a warrant are presumed reasonable.

Here, Plaintiff does not appear to be challenging the reasonableness of the arrest itself,

but rather the reasonableness of Kollie and Hargrave's actions incident to the arrest. Plaintiff

cannot state a valid Fourth Amendment claim on any of the grounds he offers. First, there is

no constitutional requirement that an officer explain a warrant aloud when carrying out an

arrest so long as the arrest is supported by probable cause. Nor is there any constitutional

requirement that an arrestee be comfortable throughout the duration of the arrest. Plaintiff's

discontentment with the circumstances surrounding his arrest does not create any issues of

constitutional concern. Plaintiff has not offered any allegations or legal support for his

assumption that his arrest violated the Fourth Amendment.

To the extent Plaintiff argues that Kollie and Hargrave were deliberately indifferent to

Plaintiff's health or safety by transporting him barefoot wearing only thin safety scrubs in a

cold vehicle, Plaintiff has not alleged that he suffered any harm or injury as a result of his being

cold during the car ride. *See Short*, 87 F.4th at 611. And to the extent he claims Kollie and Hargrave were deliberately indifferent by failing to inform the ACRJ staff of his mental-health issues, he has similarly failed to show that their inaction caused Plaintiff any harm because Plaintiff admits that he personally told ACRJ Deputy Daidone about his hospitalization, emergency custody order, recommendation for temporary detention order, and his recent suicidal thoughts. (Compl. 32.) Accordingly, Plaintiff has not stated any viable claim for relief against Kollie and Hargrave based on the events surrounding his arrest, and his claims against them will be dismissed.

## IV.

For the reasons set forth above, the court will deny Defendants' motion to dismiss for lack of subject matter jurisdiction (ECF No. 36), grant Defendants' motion to dismiss for failure to state a claim (ECF No. 38), and dismiss Plaintiff's claims.

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 29th day of September, 2025.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE